COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-007-CV

 

 

IN THE INTEREST OF J.F., J.J., AND J.J., CHILDREN                                 

 

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction

In two points, Appellant, the Department of
Family and Protective Services (ADFPS@),
appeals that portion of the trial court=s ruling
that denied the request for termination of the parental rights of the
parents.  We reverse and remand.

 

 








II. 
Factual History

        A.  Julie, Jennifer, and Brandy F.

Appellees Brandy F. and Melburn J. are the
parents of the children John, Julie, and Jennifer.[2]  The oldest child, John, a male, was seven
years old; the middle child, Julie, a female, was six years old; and the
youngest child, Jennifer, was four years old. 








Evidence indicated that Julie and Jennifer were
sexually abused by their maternal grandfather, intervenor Danny De Los Santos (AGrandfather
Danny@).  During a therapy session with Laura Greuner,
a therapist who specializes in working with children who have been sexually
abused and who suffer from post-traumatic stress disorders, Julie confided that
she had been sexually abused by her AGrandpa
Danny.@  She told Gruener that her grandfather had
touched her private area four times, and she described how he would pull her
pants down and touch her.  Jennifer, in a
counseling session with the same therapist, told her that Grandfather Danny
required both her and her sister Julie to Aget
naked.@  He also touched both of them.  Gruener testified, A[S]he
said to me that [Grandfather] Danny touched us here and she touched herself on
her private area over her clothes to show me what she was talking about@;
Gruener also testified that Jennifer appeared to be upset when relating this
account to her.  Jennifer also told
Gruener that she had been warned by Grandfather Danny that if she told of this
event, she would never see her mother again. 

Julie also confided to Virginia Caldwell, a
registered nurse at Cook Children=s
Hospital who had an advanced certification as a forensic nurse examiner
specializing in sexual assault exams, that Grandfather Danny had put a Apink
stick@ in her
genital area and in her Abutt.@  Julie said that her clothes were off when
this happened, and that it hurt.  Julie
had also told Brandy about essentially the same sexual abuse.  Dr. Parnell Ryan, who conducted a
psychological evaluation of Julie, described Julie as a little girl struggling
with sadness who advised him that her grandfather had fondled her vagina. 








Brandy was aware of the sexual tendencies of her
father, Grandfather Danny.  In her trial
testimony, Brandy testified that Grandfather Danny started making sexual
advances toward her when she was thirteen and fourteen years old.  She also testified that at the time of these
sexual advances, she told her mother about what had occurred.  Her trial testimony was corroborated by her
admission to nurse Virginia Caldwell, who, while gathering social history
during the examination of Julie, was told by Brandy about the Aadvances@ of
Grandfather Danny toward Brandy.  Brandy
also testified that she believed in March 2004 (when Julie made her initial
sexual abuse outcry) that Grandfather Danny had sexually penetrated Julie, and
that as of the date of her trial testimony, she believed that the sexual abuse
to Julie had occurred.  Despite knowing
that Grandfather Danny had made sexual advances to herself as a child of
thirteen and had also sexually abused her daughter Julie in March 2004, Brandy
sent her children to live with Grandfather Danny in September 2004.  According to Brandy=s
testimony, it was then that DFPS Astepped
back in her life@ and demanded that she remove
the children from Grandfather Danny=s home.

B.  The
Safety Plan

DFPS worker Christiana Smith began working with
the family in December 2004.  Her role,
as a Family Based Safety Services worker, was to provide parent and counseling
services and to attempt to negate the issues that had caused Brandy and Melburn=s family
to come to the attention of DFPS.  To
accomplish this, a Asafety plan@ was
agreed to between Brandy and DFPS that included a prohibition of any contact
between John, Julie, and Jennifer and Grandfather Danny.  Brandy also agreed to individual therapy for
herself, individual therapy for the children, parenting classes, random drug
tests to insure that she was drug free, and participation in a drug assessment
if any drug tests were positive.








As a result of the agreed-upon drug testing,
Brandy tested positive for marijuana and pain killer medication.  In April 2005, this safety plan violation
resulted in the children=s being required to stay with
Brandy=s
mother, Robin F., who was to supervise all contact between the children and
mother.  Thereafter, Robin=s
boyfriend, Terry Bowers, began to exhibit signs of alcohol abuse.  Bowers appeared at her home at 2:00 a.m.
drunk, screaming, and banging on the door. 
As a result, DFPS requested that he participate in treatment to address
his alcohol abuse.

Caseworker Smith continued to provide services to
Brandy, including providing bus passes for transportation and actually
personally driving Brandy to some of the provided services.  However, Brandy was dropped from her drug
abuse classes for noncompliance, the children were not taken to counseling
(even though DFPS paid for this service and agreed to assist in
transportation), and Brandy was caught by a DFPS worker having unsupervised contact
with the children by taking them to school and picking them up from school by
herself, in violation of the safety plan.








In addition, Brandy allowed Grandfather Danny to
be in the car with the children as they traveled to a counseling session with
Gruener, a situation that concerned Gruener because it was a safety plan
violation and because the children were being taken to the therapy sessions
where they were likely to talk about the sexual abuse perpetrated on them by
the same man who would be driving them home following the therapy session.  Finally, DFPS discovered that Brandy had
allowed the children to have contact with Grandfather Danny at a Chuck E.
Cheese restaurant when Jennifer told Gruener that Danny warned her that if she
told anyone about the Chuck E. Cheese meeting, she would never see her mom
again.  Brandy admitted to this AChuck E.
Cheese safety plan violation@ and
admitted that she was actually present at the restaurant when it occurred.  Brandy admitted that her violations of the
various safety plans were numerous and that she violated these agreements every
single day.

C. 
Domestic Violence








In October 2005, the children were removed from
Robin=s care
and placed in foster care.  Once in
foster care, the children told of many other instances of exposure to abuse and
neglect, including regularly witnessing domestic violence between their
parents.  Brandy admitted in her
testimony at trial that she and Melburn had exposed the children to violent
confrontations and testified to examples of these instances, describing one
instance in which each parent was hitting each other in the mouth while in a car,
with John and Julie watching.  Brandy
described the Aassault in the vehicle@ to CASA
volunteer Randee Kaitcer, telling her that Melburn punched her in the mouth and
made her bleed.  Kaitcer confirmed that
Julie witnessed this bloody assault. 
Julie further described instances in which the two parents would yell
and scream, and Melburn would grab Brandy and push her up against something to
shut her up.  Brandy admitted that John
would clearly be affected by the violence, and that he yelled at his father to
stop hitting his mother.  Brandy also
testified that the children were present during most of her domestic violence
fights, and they would usually have to be pulled from the room by family
members.

As a result of witnessing this violence, John
confided to Gruener that he had witnessed his father hitting his mother and
that he was angry, and now  he Aacted
out@ his
anger.  John advised therapist Dr. Balla
that he did not want to be like his dad, and he did not want to be so
aggressive and violent like Melburn. 
Julie told Gruener that she had seen her father hit her mother, that it
made her mother bleed, and that she was Ascared
about that.@ 
She also confided to the psychologist, Dr. Ryan, that she had witnessed
her father punching her mother in the face and that she had been exposed to the
violence between her parents.








Brandy and Melburn also exposed the children to
sexual acts between the parents.  Brandy=s
explanation was that, since all of the family lived in one room, she and Melburn
proceeded to do what Aadults do.@  John told Dr. Ryan that based upon his
exposure to watching his parents, he was acting like his parents and was
attempting to perform such acts on his sister. 
Julie confirmed this by telling Dr. Ryan that her brother John lay on
top of her and slobbered on her neck, describing this as Asex@ because
she saw her mother and father do this. 
Nevertheless, there was also testimony that the children loved their
mother and had a bond with her.

D.  Overall
Compliance

By the time this case went to trial, Brandy had
failed to complete her drug classes (having been discharged three times for
noncompliance), had not taken GED classes, had not attended nonoffender sexual
abuse classes, had not attended her therapy sessions for domestic violence, and
was virtually noncompliant with her individual therapy.

E. The Father








Melburn had been convicted on two separate
occasions for felony offenses, and Brandy told Kaitcer that Melburn had been in
and out of incarceration throughout their entire eight-year relationship.  Melburn was still incarcerated, both when he
initially filed a pro se Aanswer@ to the
termination suit in which he stated, AAt this
point [in] time I don=t have any family on my side to
care or take custody of my children,@ and at
the time of trial.  In this Aanswer@/correspondence
to the trial court, he also asked certain questions about the children, which
questions were not addressed by DFPS.  At
some point Kaitcer, the CASA volunteer, answered these questions and
corresponded with Melburn, at one point asking him about family members willing
to take care of the children.  Melburn
provided her with the name of his mother, Joanne J., and on June 16, 2006,
Kaitcer forwarded that information to the DFPS caseworker, the CASA supervisor,
and the ad litem. 

F. 
Paternal Grandmother

In August 2005, the month before proceeding to a
final trial on the merits, DFPS sent a certified letter to paternal grandmother
Joanne J. (AGrandmother Joanne@)Calso
known as Joanne De Los SantosCasking
if she wanted to be a placement option for the children.  DFPS had been aware of her existence since at
least the time of the removal of the children; the removal affidavit attached
to the petition listed her (by the name of Joanne De Los Santos) as one of the
people with whom the children had lived within the past five years.  However, DFPS made no attempt to approach
Grandmother Joanne until August 2005.  At
the time of trial,  Grandmother Joanne
had completed the paperwork necessary to start the process known as a Ahome
study,@ but the
home study had not been completed.








Grandmother Joanne testified that she wanted the
children to be placed with her and her husband Alfredo De Los Santos, who is
the brother of Grandfather Danny. 
However, Brandy testified that she did not believe that anyone in
Melburn=s family
was appropriate to take care of the children. 
Grandmother Joanne testified that she did not believe the sexual abuse
outcries of her grandchild Julie and that Julie loved Danny and therefore there
was no way that the sexual abuse by Danny could have occurred.  Grandmother Joanne was confused in her
testimony about how long it had been since she had had contact with the
children, but she testified that it could have been three years since the
children had lived with her.

Grandmother Joanne also said that she had at one
time lived in Midlothian, Texas, but had moved to this area in an attempt to
hide from her own brother, who had murdered her mother.  She testified that there were five people
living in her three-bedroom mobile home, and that there were only sixty-five
dollars left in her household account each month after all expenses were
paid.  Grandmother Joanne also admitted
that she had been investigated by DFPS on one occasion and had been arrested
and placed on probation for assault.  She
testified that DFPS had begun the process of a home study on her by sending a
packet of home study paperwork to her approximately one month before trial,
which was approximately two days after her conversation with DFPS.  She testified that she had returned the
paperwork to DFPS on September 18, seven days before trial, and that the delay
was due to the paperwork=s being forgotten and placed on
the dashboard of her husband=s car.

 








III. 
Procedural Background








Upon the removal of John, Julie, and Jennifer
from Brandy and Melburn, DFPS filed on October 19, 2005, its APetition
for Protection of a Children, for Conservatorship, and for Termination in Suit
Affecting the Parent-Child Relationship@ in
which DFPS requested, inter alia, that Brandy=s and
Melburn=s
parental rights be terminated and a permanent conservatorship be implemented,
and its AOrder
for Protection of Child in an Emergency and Notice of Hearing.@ The
trial court entered an order naming DFPS as the temporary managing conservator
of the children, and it further found that there would be a continuing danger
to the children if they were returned to a parent.  Brandy was served with the lawsuit and was
also appointed an attorney to represent her in the DFPS litigation.  Brandy filed a general denial on October 27,
2005, and the next day Melburn was served with the lawsuit while he was incarcerated.  On November 7, 2005, the trial court received
Melburn=s pro se
general denial.  One week later, the
trial court conducted the full adversary hearing.  The court made a specific finding that Aplacement
of the children with the children=s
noncustodial parent or with a relative of the children is inappropriate and not
in the best interest of the children.@  In its judgment, styled AOrder
Modifying Managing Conservatorship@ and
dated December 20, 2006, the court appointed DFPS as permanent managing
conservator of the children, but it did not order termination of parental
rights[3]
for reasons to be discussed.

IV. 
Sanctions

In two points, DFPS asserts error on the part of
the trial court by concluding as a matter of law that DFPS=s
failure to timely comply with a portion of Texas Family Code section 262.114
prevented the trial court from making a determination on the pleadings seeking
termination of the rights of the parents as to both statutory grounds for
termination under Texas Family Code sections 161.001(1)(D)-(E) and the Abest
interest@
requirement for termination under Texas Family Code section 161.001(2).  Tex.
Fam. Code Ann. '' 161.001(1)(D)-(E), 161.001(2),
262.114(a) (Vernon Supp. 2006).

A. The Statute

Texas Family Code section 262.114 reads as
follows:








Before a full adversary
hearing . . . the Department of Family and Protective Services must perform
a background and criminal history check of the relatives or other designated
individuals identified as a potential relative or designated caregiver . . . on
the proposed child placement resources form . . . . The department shall
evaluate each person listed on the form to determine the relative or other
designated individual who would be the most appropriate substitute caregiver
for the child and must complete a home study of the most appropriate substitute
caregiver, if any, before the full adversary hearing.  Until the department identifies a relative or
other designated individual qualified to be a substitute caregiver, the
department must continue to explore substitute caregiver options.

 

Id. '
262.114(a) (emphasis supplied).













The trial court=s
judgment denied DFPS=s request to terminate parental
rights because DFPS was not in complete compliance with section 262.114.[4]  This reasoning is confirmed by an examination
of the record and exchanges between DFPS counsel and the court.[5]  In essence, the trial court determined that
the appropriate sanction for DFPS=s failure
to complete the home study on Grandmother Joanne was for the trial court not to
consider, and hence deny, DFPS=s
request for termination both on statutory grounds and Abest
interest@
grounds.  The trial court=s
conclusions of law reiterated this as follows:

1.  The Court concludes as a matter of law, that
the provisions of Texas Family Code, Section 261.114 entitled Evaluation of
Identified Relatives and Other Designated Individual; Placement, create
mandatory actions to be taken by the Department of Family and Protective
Services.

 

. . . . 

 








3.  The Court concludes as a matter of law that
the failure of the department to comply with the provisions of Texas Family
Code, Section 262.114 prevents the Court from making a determination on the
pleadings seeking termination of the rights of Respondent parents, as to
grounds for termination.

 

4.  The Court concludes as a matter of law that
the failure of the department to comply with the provisions of Texas Family
Code, Section 262.114 prevents the Court from making a determination on the
pleadings seeking termination of the rights of Respondent Parents, as to the Abest interest@ requirement.

 

The statute itself, however, provides no sanction
for the failure to perform a home study on all possible placement options, nor
does it prevent the trial court from considering termination.  Therefore, it is the trial court=s
determination that this preclusion of consideration of termination was an appropriate
sanction that is the subject of this appeal. 


B.  Melburn=s and
Brandy=s Responses

Melburn and Brandy initially responded to DFPS=s points
by asserting that any error committed by the trial court was invited by DFPS
and, therefore, any assertion of that error has been waived.  Specifically, Melburn asserts that by not
joining Brandy=s motion for an extension of the
dismissal date, which would have allowed up to an additional 180 days for trial
and the opportunity to complete the home study in question, DFPS invited error
by the court.  Melburn and Brandy further
assert that by submitting a judgment containing the sanction language of which
DFPS now complains, DFPS has waived its present complaint.  We reject these arguments.  








First, the sanction question before this court
appears to be one of first impression, and DFPS could not have known that by
going to trial when it did that the sanction for its failure to complete the
home study on one individual would be the refusal of the trial court to
consider the requested termination. 
Second, the judgment submitted by DFPS was approved by them as to form
only and was based on the visiting trial judge=s oral
pronouncement in court.  This court has
previously held, AA party should not be estopped
from challenging a court=s order when the party provides
to the court a proposed order following what it believes was the court=s ruling
at the hearing, and the court signs it.@  In re Bahn, 13 S.W.3d 865, 875 (Tex.
App.CFort
Worth 2000, no pet.); see also Hardy v. Mann, No. 01-05-010800-CV, 2007
WL 1299661, at *15 (Tex. App.CHouston
[1st Dist.] May 3, 2007, pet. filed); John Masek Corp. v. Davis, 848
S.W.2d 170, 174-75 (Tex. App.CHouston
[1st Dist.] 1992, writ denied).  This is
particularly true when the motion to enter judgment recites that the proposed
order is recounting the oral pronouncement of the court and docket entry and
that the proposed order is agreed to by the party as to its form and not as to
its substance.








DFPS, for its part, asserts that Brandy and
Melburn waived their rights under section 262.114 of the family code by failing
to request the trial court to order compliance with the statute.  We reject this argument because it attempts
to shift the burden articulated by the statute and is contrary to the plain
language of the statute indicating that it is DFPS, and not the parents, that
has a duty to perform, that is, to complete the requisite home studies.

C. 
Appropriateness of the Sanction

As previously recounted, the statute does not
prescribe a sanction or consequence of DFPS=s
failure to complete one of the requisite home studies.  As articulated by our Texas Supreme Court, AWe
should not invent a remedy that the Legislature itself could have, but did not,
specify.@  State v. Roland, 973 S.W.2d 665, 666
(Tex.) (citing Hines v. Hash, 843 S.W.2d 464, 467 (Tex. 1992)), cert.
denied, 525 U.S. 935 (1998). 
Further, 

[t]here is no presumption
or general rule that for every duty imposed upon the court or the Government
and its prosecutors there must exist some corollary punitive sanction for
departures or omissions, even if negligent. 
In our view, construction of the Act must confirm to the great principle
of public policy, applicable to all governments alike, which forbids that the
public interests should be prejudiced by the negligence of the officers or
agents to whose care they are confided.

 

State v. $435,000.00, 842 S.W.2d 642, 644 (Tex.
1992).








AThis is not the only statute
that says something >must= be done
but does not say what happens if it is not.@  In re Francis, 186 S.W.3d 534, 540
(Tex. 2006) (orig. proceeding).  Examples
in cases include, as enumerated in the Francis case, Hines, 843
S.W.2d at 467 (holding that DTPA=s
mandated notice requirement was served, not by tossing out noncomplying
consumers, but by abating the suit); Hubenak v. San Jacinto Gas Transmission
Co., 141 S.W.3d 172, 184 (Tex. 2004) (determining consequences of condemning
authority=s failure to negotiate land
price as statutorily mandated); Lubbock County, Texas v. Trammel's Lubbock
Bail Bonds, 80 S.W.3d 580, 584 (Tex. 2002) (determining that consequences
of following mandatory procedure is abatement until procedure is followed); Helena
Chemical Co. v. Wilkins, 47 S.W.3d 486, 494 (Tex. 2001) (determining
consequence of failure to submit claim to arbitration within statutory period);
$435,000.00, 842 S.W.2d at 644 (holding that dismissal is not a consequence
of State=s
mandatory duty to hold forfeiture hearing within the prescribed time); Schepps
v. Presbyterian Hospital of Dallas, 652 S.W.2d 934, 938 (Tex. 1983)
(determining that the purpose of the mandatory notice requirement was better
served by abating cause of action to allow intended negotiations rather than
terminating plaintiff=s substantive rights).








AWhen [a] statute is silent about
consequences of noncompliance, we look to the statute=s
purpose in determining the proper consequence of noncompliance.@  Albertson=s, Inc.
v. Sinclair, 984 S.W.2d 958, 961 (Tex. 1999); see also
Hines, 843 S.W.2d at 468; Francis, 186 S.W.3d at 540.  We should start with the presumption that the
legislature intended a just and reasonable result in enacting a statute, In
re D.R.L.M., 84 S.W.3d 281, 290 (Tex. App.CFort
Worth 2002, pet. denied), and when determining its purpose inquire if that
purpose is better served by a different consequence than that propounded by the
trial court, Hines, 843 S.W.2d at 468. 


We now turn to the purpose of this statute.  Reading the plain language of the statute
itself and referring to the bill analysis of the Senate=s
Committee on Health and Human Services, that purpose is obvious: the protection
of innocent children.  Reading from the
analysis of the overall bill, of which section 262.114 is a part, we read that

C.S.S.B. 6 seeks to
strengthen the state=s ability to protect
society=s most vulnerable
citizens: abused children, the elderly, and the frail.  The bill responds to the governor=s executive orders calling
for the systematic reforms of Child and Adult Protective Services.  These orders came in response to numerous
cases in which children and elderly persons were left in states of abuse or
neglect, despite agency involvement, resulting in severe harm or even death.

 

S. Comm. on Health and Human Services, Bill
Analysis, Tex. S.B. 6, 79th Leg., R.S., at 1 (2005).  With regard to the specific section of the
bill in question, we also read that Section 262.114(b)








Requires DFPS to place a
child only if DFPS determines that the placement is in the best interest of the
child.  Authorizes DFPS to place the
child with the relative or designated individual before conducting the required
home study, only in exigent circumstances, as determined by DFPS on an
individual basis.  Requires DFPS to
consider the child=s safety to be the
paramount concern in determining the placement of the child.

 

Id. at 7 (emphasis supplied).  

Considering the foregoing, we conclude that it is
the safety of children that is of paramount importance; and considering the
statute=s
purpose and the background of this case, we hold that the purpose of this
statute is better served with a consequence different from that propounded by
the trial court, in that a preclusion of consideration of termination under
these circumstances cannot possibly be in the best interest of the welfare of
these children.

We now turn to the propriety of the sanction
imposed by the trial court, which amounts to a Adeath
penalty@
sanction as to the issue of termination. 


D.  ADeath
Penalty@ Sanction








By refusing to consider the termination request
made by DFPS, and thereby denying the request, the trial court in essence
issued a Adeath penalty@
sanction against DFPS as to that requested relief.  In civil discovery abuse cases, there must
first be a direct relationship between the offensive conduct and the sanction
imposed, and secondly, the sanction must not be excessive but must Afit the
crime,@ that
is, the court must consider the availability of less stringent sanctions and
whether such sanctions would promote compliance.  TransAmerican Nat. Gas Corp. v. Powell,
811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding).  We believe that the same reasoning applies to
the situation before us.  

This court has previously been faced with a
situation in which the trial court failed to hold a full adversary hearing not
later than the fourteenth day after the Texas Department of Protective and
Regulatory Services (TDPRS) took possession of a child pursuant to an ex parte
temporary order.  See Tex. Fam. Code Ann. '
262.201(a) (Vernon 2005); In re J.M.C., 109 S.W.3d 591, 595 (Tex. App.CFort
Worth 2003, no pet.).  We held that under
that situation, the proper remedy was for the parents and TDPRS to mandamus the
trial court to conduct the adversary hearing promptly.  J.M.C., 109 S.W.3d at 595.  Analogously, one remedy for the failure of
DFPS to complete Grandmother Joanne=s home
study in a timely manner was for the trial court, either on motion of the
parents or sua sponte, to order DFPS to complete the study as soon as possible
and prior to a trial on the merits. 

We hold that the sanction imposed by the trial
court, which was in essence a Adeath
penalty@
sanction as to the termination of parental rights, was  excessive under the circumstances.

 

 

 








V. 
Conclusion

For the foregoing reasons, we sustain DFPS=s two
points, reverse the trial court=s order
modifying managing conservatorship, and remand this case to the trial court for
further proceedings.  See Tex. R. App. P. 43.2(d).

 

 

 

BOB
MCCOY

JUSTICE

 

PANEL A:   HOLMAN,
GARDNER, and MCCOY, JJ.

 

DELIVERED: October 11,
2007

 











[1]See Tex.
R. App. P.
47.4.





[2]The names of all minors
in this case have been changed; J.F. will be referred to as John, the older
J.J. as Julie, and the younger J.J. as Jennifer.





[3]AIT IS ORDERED that all
relief requested and not expressly granted herein is hereby denied.@





[4]AThe Court finds that CPS
failed to timely comply with Texas Family Code Section 262.114 therefore,
termination is denied.@





[5]

The Court: . . . . Do you
interpret that 262.114 as a Ashall@ statute?

 

[Counsel for Melburn]:
Yes, Your Honor.

 

. . . . 

 

The Court: Well, I=ll go back to where I was
a moment ago with it being a Ashall@ statute, and in my opinion that the short period
of time that the State has given or CPS has given the paternal grandmother to
respond, in my view, they have not yet complied with that statute.

 

. . . . 

 

The Court: . . . . I just
simply stated that 262.114 is sort of a gatekeeper type of process.

 

[Counsel for State]:
Okay.

 

The Court: And they didn=t jump through the gate
properly.

 

[Counsel for State]: And
the end result is?

 

The Court: Is termination
denied.

 

[Counsel for Ad Litem]:
With no deliberations as to best interest or grounds?

 

The Court: That=s correct.

 

. . . . 

 

[Counsel for State]: . .
. . [I]t=s the appellate courts
that make the distinction between grounds as opposed to best interest, and it=s quite clear to me that
your position is that you could not make a determination on either one of those
things because of my client=s failure to comply with that gateway statute, so
that=s why I want it to be
crystal clear to the Appellate Court that because of my client=s failure, you were not
going to be able to consider either the grounds or the best interest analysis.  It was over once the Court determined that my
client failed totally in that, with that 262.114 statute.

 

The Court: Anything
further?

 

[Counsel for Melburn]:
Your Honor, I would just for clarification from the Court that that was the
Court=s intent that --

 

The Court: Clearly it
was.

 

[Counsel for Melburn]:
All right.

 

The Court: Clearly it was.